Most of you, I think, are veterans at this, so you know the rules. But the most violated is that we can't hear you. So during your argument, please stay in the microphone, keep your voice nice and loud so we can hear your answer as well as hear your argument. You know the red light system and so forth, but the main thing is if we have questions for you, please answer those questions succinctly. That having been said, first case, United States v. Nguyen. Mr. Roper. Good morning. May it please the court and counsel for the government. My name is Richard Roper. I represent the appellant, defendant in this case, Avan Nguyen. This is an appeal from a sentencing imposed by Judge McBride in the Fort Worth Division in the Northern District of Texas where he imposed an upward departure to the maximum sentence possible of 36 months and a $250,000 fine, which was twice the original guideline range as recommended by the probation office and three times the guideline range for the fine. The case started with the execution of a search warrant by the Internal Revenue Service. The warrant was the defendant's wholesale nail salon business that catered to Vietnamese nail salon owners throughout the country. The government seized in that raid money from bank accounts and monies found in a safe of Mr. Nguyen on the premises of his warehouse. About $3.5 million was seized altogether. The basis of the search warrant was structuring activity that the IRS determined from the review of bank accounts of Nguyen. This structuring activity was not from Nguyen. There was no evidence that Nguyen engaged in structuring. Well, let me ask you a question about that. How does it, does that imply that all the people who were paying him for nail salon, by the way, what do you buy for a nail salon? Were they buying those little fish or were they you know, like clippers and polish and buffers and stuff? I actually went out to the nail salon business. It's all of that, Your Honor. Okay. I never have worn nails, I don't know. Well, nor have I, I'm sorry to say. But my point is, he's catering to this group of Vietnamese people, presumably if it's all over the hundreds of clients. How does it happen that all of them are just coincidentally sending in payment checks for $9900? Well, not, they were, but. A number of them. It was. A number of them were. Several million worth, yes. Well, that was their problem in doing it, in paying it. But they had a large volume of business and it may be part of the reason, the reason they had accounts in other cities, because a lot of nail salon businesses dealt with cash and they had to deposit cash. I understand that, but there's a reason, there's normally a reason why you, either they were always purchasing less than $10,000 worth of goods, a couple hundred dollars less, or else they were deliberately depositing that and thereby engaging in their own sort of tax fraud, which I can't fathom. Why does, wasn't it a reasonable inference to draw that you do not put a structured amount into somebody's account unless that person has told you to do so? Well, Your Honor, I think it would be speculative. The IRS never. I'm not saying it's speculative. Isn't it a reasonable inference? That's the whole basis of your argument. No, Your Honor, I don't think it is. First off, it was only 25% of the whole deposits that were going into his bank accounts. Only 25% of the deposits that were made were structured. And the IRS never, they never obtained the bank accounts, and this is important, of the customers that were putting in. So you don't know, you don't have a basis to conclude that there was a cash hoard in the bank account where they were splitting up deposits. You never had that. The IRS never, and the talking about Nguyen of Lee Nails, talking about that. We couldn't prove structuring by Nguyen because we didn't seize his bank accounts, and I think it's important. Well, that was their decision, I suppose, but my point, but again, they did not object to the forfeiture. Is that right? Yes, we did. Well, we agreed into an amount of forfeiture. And how much was that? $1.1 million. Right. And what was the basis for the forfeiture? The basis of the forfeiture was that there, we did not contest the fact that there was structuring going into those accounts in amounts up to $1.1 million. But that doesn't mean, and the government could obtain a forfeiture order, whether Nguyen had any involvement in the structuring or not. And that's important. Well, if it's his account, and it's his business, who's doing the structuring? He or his wife? Or their accountant? Or who benefits from structuring in a circumstance like that? He didn't benefit from it in this case. Well, he got caught, but who would plausibly benefit from not complying with the currency transaction rules? His customers. Why? Because they're putting money in, in an effort, if you follow, I still think there's not sufficient evidence to show they were guilty of structuring under law. But I think it would benefit them because they would be not alerting the bank to the fact that they were depositing money flowing into an account where a CTR would have been filed and IRS possibly could have found that they weren't reporting income. So how can the IRS take money out of Nguyen's account for structuring if the illegal activity is being done by his customers? That seems like appropriation of his money. Well, that's what the law provides. The law provides that they can forfeit money. It's an NREM proceeding, Your Honor. I understand that, but normally they forfeit from the guilty party. They don't forfeit from the... My point. That was... But you agreed to the forfeiture. Well, because they were going to move to forfeit even more than that. But you had a right to defend, didn't you? Yes, we had the right to defend, but Your Honor, it didn't matter whether Nguyen was participating in the forfeiture or not to allow the government to obtain the forfeiture. But that's what I don't know. That's what I don't understand. If I'm a drug dealer and I buy a diamond ring, right, then whoever I purchase, let's say, the diamond ring for my girlfriend from, so you're saying that the government can go after the $9,500 in the seller's account? Yes, the... Even if it's a bona fide, even if he's a bona fide, you know, in good faith without knowledge? They could go, no, under the civil forfeiture law, they could have forfeited the proceeds of the crime of the structure. Correct, the proceeds. They could have seen, and it had nothing to do with whether Nguyen was involved in it or not. All right, but it was his accounts, though. Yes. Okay. And I'm not contesting that, Your Honor. All right. The, but going back to the fact that after they seized the cash, and after they seized the money in the bank accounts, they began an investigation, and they found out that Nguyen was involved in tax fraud for the cash, not the money that was coming into the bank accounts, but rather cash that was received from walking customers that would come into the, to his business, and that was the basis for the tax fraud, was the fact that he wasn't underreporting cash walking business that was coming into his customers, and that resulted in the tax fraud conviction, and where he agreed that he did not report, that he did not pay taxes on approximately a little less than $200,000 in taxes, and as a result of that, he was guilty. And then the probation office found in the precinct report that they should have, that there was a basis for an upward departure based on uncharged conduct. Then the court, at that point, entered an order, as Judge McBride would want to do, essentially saying, I think there is an upward departure, even to the degree, and I've concluded that an upward departure is appropriate, and even to the point that I think the plea agreement should be rejected because it limits my ability to sentence him only to three years. Even assuming, even assuming, you know, there's a range of discretion, and assuming from your standpoint, you would argue, at best, at worst, Judge McBride is at the outer limits of whatever that is. Nonetheless, if the structuring is over here, which as you say, from your standpoint, you know, Nguyen is unaware of it, but there's no doubting that it occurred. So it's over here, there's the structure, etc. On the other hand, there's the tax fraud, which is customers coming in, to which he is culpable, right? Yes, sir. So you've got this whole milieu, dealing with the finances, of which the defendant's in the sentence, part of which he knows, part of which he doesn't. So my question is just, given the discretion, albeit if you're at the other end, at the far end, why couldn't Judge McBride reach the inference he did? In other words, state it differently, why is what he did beyond the edge of the discretion he, as a sentencing judge, can exercise, given that total milieu that's there? You follow me? Uh-huh. Well, if I was there, I wouldn't do it, but given all that's there, and if he's there, and he doesn't accept what the government has agreed to do, he said, fine, that's y'all. You charged him, if it were me, you know, I'd charge him with something else. So the question is, what's the reversible error, given all that discretion? Well, it is discretion. It has to be plausible, and I say it's not plausible. I think it's speculative that Wynn engaged in obstruction activity. He had to aid in a bet or assist in obstruction in some way, and there's just no evidence that he did. But in other contexts, not like this, in other cases, whether it's drugs or whatever, I say, well, okay, you can't look the other way when all this stuff is happening, and then later say, well, I didn't know about it. I mean, we charge on deliberative, and I'm not saying this is a deliberative case, but I'm just saying, again, given the milieu, the judge is saying, over here, you've got the same base of customers who's doing whatever. You've got the tax . . . it's all kind of happening. Aren't you really saying, hey, I didn't know it was happening, dot, dot, dot, therefore, you, trial judge, cannot make the inference that you're making? And so whether . . . I know you disagree with it, but I'm still back at my question. Why is that beyond the pale? Or stated another way, what's the strongest case you have for the reversible error on what he did? I understand your argument why it should be, but I'm just saying, what's the strongest case that in this sentencing realm, where there's so much discretion, you know, with you? This isn't like a Beecham issue that's, you know, totally different. You've got to prove up similarity. Here, you might say, well, this is intrinsic to the whole deal because it's all instruction. So I'm just trying to get to where . . . I don't have a problem understanding your argument. I'm just trying to get to where the reversible piece comes. It's speculative, and I think it's not plausible. What about the Chase letter? Well, several things about the Chase letter. First off, it was an unsigned letter that the government subpoenaed from the bank, okay? No one ever asked the bank officer was it mailed. Nobody ever asked when was it received. It was just a letter that was found in the file. That's the state of the record. They never showed the letter was mailed. There was . . . they never asked when about it. They never . . . the agent got up on the stand and said that they didn't talk to anybody about it. We don't know. We just have a letter that came from the records of the bank. But even that, I don't think that's sufficient. Now, there's one thing I want to point out that I think is important in this case, and I think it shows the wordsmithing that Judge McBride did, and essentially my argument is it's more hat than cattle in his findings. He makes a comment, and the government takes off on that, and I think it's incorrect. He made a suggestion in his 1363 of the record, and it shows you, I think, where Judge McBride was coming from. He cites from a document that says case summary that was prepared by the IRS. Essentially what he did was after the government refused to go along with the upward departure, he ordered the government to turn over the files, and he poured through the files looking for evidence to support his finding. And he looks at a case summary, which is really a recital of what was happening in the case, and he said they settled and they did an administrative forfeiture agreement. And he says in that, and he quotes from not the administrative forfeiture agreement, which is in the record, or the plea agreement, but rather the agent's notes, and it says that there was a forfeits $1.1 million as a result of the currency structuring activity. Your Honor, that is not from the administrative forfeiture agreement. The government cites it in its brief as coming from the plea agreement. That is not correct. That was just a recital of what the agent thought the administrative forfeiture agreement says as a result of his structuring activities. That never occurred, and that's really important. I hope the court considers that. The fact of the matter is there was no admission by Nguyen. There was no evidence to show no motive that he had. All the deposits went to his accountant. That was not involved in the structuring allegation. It had nothing to do with it. The customers' deposits, you know, maybe they are guilty of structuring, but the question is, was he involved in it? All right. Thank you, Mr. Roper. You've reserved your rebuttal time. Ms. Falconer? Were you counsel in the trial court? Were you counsel? No, no, Your Honor, I was not. Just a curiosity question. Good morning. I'm Emily Falconer of the United States. Okay. You've got to give me a theater voice. Oh, I'm sorry, Your Honor. I'll speak up. Emily Falconer of the United States. I'd like to start off by just noting that the government has not changed its position from the position it took in the district court. The government was of the opinion of the district court that a guideline sentence was appropriate. That's what we advocated to the district court. Ultimately, the court disagreed. That's not what the question is on appeal. The question is whether, not really whether I or Mr. Roper or any member of this panel would have viewed this case differently, might have handled it differently, might have reached a different conclusion. The question is whether the district court clearly erred in finding that Mr. Nguyen was a participant or somehow directing his customers' undisputed structuring activities. The standard review here is whether that was plausible from the evidence in the record, from the PSR, from the documents, from the testimony at the sentencing hearing, which substantially developed that evidence that was in the PSR. Now, this court has said, and we cite this case a number of times, we cite one case in our brief, the Price case, that this court must accept a district court's factual findings if they are plausible in light of the record, regardless of whether the court itself would have reached a different conclusion. Now, looking at the evidence here, there's no way for me to conclude that it was clearly erroneous or implausible for the court to conclude structuring. Just to look at that evidence quite briefly, there were three elements that were required to be found in order to find that he was criminally responsible for his customers' structuring activities. The first is that he was aware of the bank's reporting requirements. The second was that he somehow participated or was engaged in the structuring. In this case, it would have been directing the customers to structure those deposits. And the third being that those deposits were structured with the purpose of avoiding those reporting requirements. Now, the third element is largely undisputed. I don't think that Mr. Roper disputes that those $9,000 deposit after $9,000 deposit were structured that way to avoid reporting. So the first two elements are really the only ones that are in play. With respect to knowledge, you have two pieces of evidence the court relied on. One is the Chase bank letter. And the other... What is the evidence that was sent? Your Honor, I mean, the question is we have the Chase bank letter. It was presented to the district court. Those arguments were presented to the district court. How do you know...  Is there any affirmative evidence that was put in an envelope or mailed? Or part of an email account? I mean, Chase communicates with me by email. No. I mean, there's no evidence one way or the other whether he actually received it. I mean, so there... I guess that evidence is susceptible to... Was it evidence that it was sent? I don't believe that was in the file. I think they found it in the bank's file. I don't think they sent it by registered mail. I don't think there's any evidence of that. But I don't think there needs to be. I mean, the question is, do we think that, you know, the court could look at that letter? It was in the bank's file. It was clearly written to him. And the court could say... Could either infer that he did receive it or infer that maybe it got lost in the mail or wasn't actually sent. I mean, that was the district court's prerogative to weigh that evidence. I don't think the government was required to prove... I don't think even at a trial we would be required to prove that the letter was sent. But at any rate, other evidence here corroborates the idea that it was sent and received. The main one being that after the date of that letter, which was June of 2012, five days after the date on that letter, he goes to the secretary of state of the state of Texas and changes the name of his business substantially to from Nava Material Goods to Avon Materials. Then several days after that, he goes to the banks, opens new accounts under new names at Chase and at Wells Fargo. And all of a sudden, all the structuring activity that was happening in those other accounts under one name is now happening in new accounts under a different name. Now, that evidence tends to suggest and the timing tends to suggest he did receive that letter. And that was a response to the letter. But at any rate, weighing and assessing the evidence in the record is for the fact finder to do. Absent some evidence that he didn't receive it, which we don't have in the record, the district court was free to infer that he did based on that other evidence. What about the second one, the second factor? The factor. You said there were three elements. Yes, yes. So the first one is the knowledge, which established by the Chase bank letter, also could be established from his business background. That's this court's case in Rodriguez. So it can be inferred from the circumstances, the knowledge, even if we think he didn't get the Chase bank letter. Now, with respect to the second element, that's his participation, his actively engaging in the structuring activities. There's a couple of things. It can, one, be inferred simply just from the circumstances of the fact that you have multiple bank accounts, multiple customers in multiple parts of the country, unrelated to one another, all of them making these deposits into Mr. Nguyen's account. What benefit does he get from it? Mr. Nguyen? And the benefit he gets is that those deposits aren't being recorded. And, you know, aren't being reported to the IRS. And he, therefore, cannot report that on his taxes and doesn't have to pay income tax on them. I don't understand that. So, I mean, if he is getting all those cash deposits in his bank accounts, I mean, he doesn't have to report. I mean, if my understanding is that if the bank files a currency transaction report, that that information is available to the IRS. So when he files his taxes in 2011 or 2010 and says he made 5 million when really he made 10 million, there's no way for the IRS to know that that's not true, absent, you know, an audit or subpoena into his records. But just as a general matter, if those CTRs, those currency transaction reports, are being filed, the service is aware of those transactions. Now, the record evidence shows that some of those invoices to those customers were up to $180,000 for nail supplies. All right. Was there evidence that he, in fact, did not pay taxes on those amounts? I mean, on those specific, the evidence was that he underreported his earnings by, I think, one year 5 million and the other year was maybe 3 million or 4 million. But I don't know that those were directly, I think it stands to reason it almost has to be because that was, you know, $5 million in structured deposits. What was the evidence? I mean, was there a link between the unpaid taxes and those structured deposits? I think there's a necessary link because it's a substantial part of his income. So he's underreporting his income by almost half and he is, you know, getting almost a third of his So I think there's a necessary link between it. But no, I mean, other than the fact that I think just by making that deduction, that it's a certain percentage of his income that's, he's not reporting in a certain income in structured deposits. No, I don't know that there's a direct link between the two. Did he handle his finances personally or when the monies were deposited in the bank? Is there a CPA or some other intermediary entity that's dealing with this and insulating him from knowledge? Sure, no, there wasn't. He did have a CPA who handled his finances. But with respect to these cash deposits, when the customers were making supposedly installment payments, making these structured payments, he himself, you can see this in government, in Exhibit 38 in the record, he himself told the investigating agents that when his customers would make these cash deposits that they would call him and say, you know, Avon, we made this cash deposit so you can check and see that it's there. So he was being alerted every time a cash deposit was made and going and verifying that. And over and over again, necessarily, he would have been getting these calls and seeing $9,000 deposit. I mean, if you look up the exhibits, Exhibit 36 is a good example of these bank records. It's pretty staggering when you see four $9,000 deposits in one day. He tells the agents, I'm getting phone calls every time one of these deposits is made. I mean, I don't see how he possibly couldn't have known or been insulated from that. Why didn't, I mean, why wouldn't this have been enough for a jury to convict him of structuring? You're talking millions of dollars and yet your brief says, which I absolutely do not understand, he under-reported gross business receipts by over $3 million for 2010 and almost $5 million for 2011. This caused a tax loss to the service of $11,902 for tax year 2010 and $80,197 for 2011. Well, you know, I make, my husband and I make a lot less than $3 million and we pay a lot more than $12,000 in taxes. So what is wrong with the government's charging practice? Yes, Your Honor. For one thing, it says $11,000 in my brief. I apologize. It was $110,000 that year in loss. I mean, he ultimately was $193,000 for those two years in tax loss. So I apologize if that's a typo. It's a pretty important digit to be dropped. But the reason why it's not that much, you know, why the disparity between the amount under-reported and the actual tax liability is that this was ultimately just a fairly low-margin business. I mean, what he was charging his customers was not particularly high, you know, it was not that much higher than what his actual costs were. So I think that's why you see these huge numbers of under-reporting and then relatively smaller numbers of liability. That begs the question. The way you just presented it, he's clearly guilty of structuring and Judge Jones asked why the government kept saying we can't prove by even a preponderance of the evidence that he's guilty of structuring. There seems to be a huge disconnect there. Well, I think that there's a difference between what I'm standing here saying today, which is that you can make this inference, you can make this inferential stuff and that wasn't clear error, than saying what the trial attorney is saying about why he didn't go forward with one of the elements necessarily requires an inferential step. Now, we could have, I think you're maybe right. I think that maybe some judges will be convinced of that. But I think that when he's making those charging decisions, he has some different things that he has to keep in mind. I mean, one thing that happens in cases quite frequently in district court is that we'll have district judges tell us, well, you get there, your evidence is sufficient, but it's thin. And I don't like to see the government bringing these cases on thin evidence with just inferences. Well, even on the sentencing, you weren't even willing to go along with the sentencing by a preponderance of the evidence. Why is that? If it was so clear that these millions of dollars, that he was doing that for tax evasion, why weren't you willing to go along with it on a preponderance of the evidence basis for sentencing? I have a couple of answers to that, Your Honor. I mean, one of those is that these conversations were happening before the sentencing hearing, before the case agents got up and testified. I mean, the trial attorney, the trial AUSA, when he's being asked by the district court, why aren't you pursuing this, has a number of reasons in mind. I mean, he says, well, I don't think the evidence is sufficient to get there. But also, he felt that the package of sentence, and he told the district court this, that the total package of sentencing was sufficient here, that he had a slam dunk tax charge. He pled guilty to that. He was going to get a guideline sentence. He had forfeited $1.1 million. He was going to pay restitution. And he just ultimately felt that that wasn't in his prosecutorial discretion. You said, you just said, we can't prove it by preponderance of the evidence. I'm not sure that he ever came out so much and said that a large part of that questioning that was going on was, was why didn't you charge it? And he said, we can't prove it beyond a reasonable doubt. I'm not sure that he ever said in so many words, we can't prove it by preponderance. But at any rate, I think there's a difference, even if he did say that, I think there's a difference between saying, I'm not going to go forward and say to the court that the only evidence on one point is an inferential step, as plausible as that step may be, and me saying on appeal, that step was enough for the district court to make that conclusion if it wanted to. He's in a different posture than I am. The government's role changes to some extent on appeal. And he is kind of answering questions based about why he did or didn't do something. And to some extent, he's under fire by the district court because the district court wanted more discretion in sentencing and was a little put out with the government for not charging more things so that it could have more latitude in sentencing. So he's a little bit on the defensive there. But the second thing is, he's making those comments before the sentencing hearing, before the agents get up and testify, before some of this evidence is more fully developed. Excuse me, but you don't put witnesses on if you don't know what they're going to say. Are you suggesting the U.S. attorney didn't confer with his own agents? Well, Your Honor, we didn't put the witnesses on. The district court called the witnesses itself. We were, I think, aware of what the general testimony would be from the case agents. But again, we weren't pursuing this. I don't think that the trial attorney was scouring the record, looking at, could I possibly prove this? Because he didn't want to prove it. He didn't want that enhanced sentence. He didn't want to pursue charges on it. So no, I think to some extent, he's answering based on a cursory review of the record, not looking to, can I prove this or should I do it? I mean, ultimately, he felt that more evidence would need to be gathered. We would need to interview the customers if we wanted to pursue criminal charges and ultimately felt that wasn't a good use of prosecutorial resources and kind of moved on from there. So I mean, I think he knows essentially what the agents are going to say, especially because it's in the PSR. But ultimately, he wasn't looking to prove structuring. So I think he's speaking, to some extent, based on not having reviewed all the evidence with an eye toward, can I prove this and how? But ultimately, whether or not he thought the evidence was sufficient is really not relevant to the determination on appeal of whether it was plausible for the district court looking at all this evidence to reach the conclusion that it did. I mean, even if the trial attorney was wrong in his assessment of the evidence, that doesn't really change the question we have before us on appeal. I do want to briefly touch on a couple of themes. One is the idea that somehow the district court's conclusion was erroneous because he relied on an erroneous fact from the PSR about whether he actually changed banks or not. I think at some point, the PSR, maybe in the second addendum, the PSR noted that he had had an account at Chase and then moved the account over to Wells. That wasn't true. Mr. Roper argued that at length at the sentencing hearing. The district court, in its statement of reasons, stated correctly that what happened was actually he opened new accounts at the same bank. So I don't think the district court relied on that fact. That fact wouldn't be material anyway. I mean, ultimately, he opened new accounts. Assuming Chase sent the letter, five days later he opens a new Chase account, will they argue in their brief Chase would have followed it anyway, that it was the same customer? So that wouldn't have obfuscated anything. So what's the inference that we need to draw from that, if Chase would have known anyway? I don't understand what difference it makes. Chase would not have known. I don't think there's anything to suggest. I mean, he argued that Chase would have known anyway. What you had is a former account under one name, which is Nava Material Goods. He goes, changes the name of his business with the Secretary of State, goes back to Chase, opens a new account under a new name. Who had signatory authority. Yeah, he's a signatory on both accounts, but I don't think there's anything in the record that suggests that, if Chase were looking at the structuring activity, they would cross-reference signatories on the accounts. I mean, if it all of a sudden, see all the structuring in one instance, a new account is open under a different name. I'm not sure that Chase would have necessarily- Did it stop under the old account? Yes, it did. Completely, yes. So it slowed down for a few days and then completely stopped. If you look at government, if you look at Exhibit 36, you can see in that column, you know, there's a date column, June of 2012. By July of 2012, there's no more structured cash deposits in the first account, and there are repeated, you know, the same high volume, high frequency, $9,000 deposits in the new account. But I don't think there's anything in the record to suggest that Chase used somehow, when it's investigating possible structuring in accounts, that it would cross-reference signatories on those accounts under different names to see if they were the same person. I mean, that's something that Mr. Roper has suggested. I think that is entirely speculative. It's not supported by the record. What was the date of the Chase letter, remind me? It was June 2012. I don't remember the exact date, but June 2012. And then the date, five days after the date of that letter,  was the date that he went to the Secretary of State and changed the name of his business. And then a week or so after that was the date, and you can see that in Exhibit 36, was when the new accounts were open and the structuring transferred to those new accounts. So I want to just briefly address the substantive reasonableness point. I only have a minute or so left here. But the substantive reasonableness argument is largely duplicative, almost entirely duplicative of the procedural error point. To the extent that the court concludes that it was not procedural error for the district court to make this structuring finding, then it would also not affect the substantive reasonableness of his sentence. Isn't there a minimum, a mandatory minimum for structuring violations? I don't know the answer to that, Your Honor, I'm sorry. I'm not talking about how they don't know if that would be the case. I believe the estimation that the parties reached at the district court was that it would change the maximum, but wouldn't have changed the guideline range substantially. But again, I don't, I haven't researched that. I'm looking into that, so I don't know. But he does mention in his brief that there were two factors, two improper factors that the court looked at, one being the pre-2010 tax fraud and the other being the fact that the rest of that $3.5 million was subject to forfeiture. He cites two pages in the record, 1358 and 1361. Those pages do not support the fact that the district court relied on those. In fact, the district court disclaimed reliance on those, specifically said it was not relying on those things and that it couldn't draw conclusions based on that. In its statement of reasons, it did not make any statement to suggest that it did rely on those improper factors. So there's really no grounds for a substantive reasonableness challenge. Thank you. Thank you, Ms. Falconer. All right, back to you, Mr. Ropa, rebuttal. Well, it's clear from the record neither the case agents or the government ever thought Nguyen was guilty of structuring, okay? None of them. And it's clear from the record they didn't. Now, they thought there was structuring activity, but not by Nguyen. As to the knowledge elements, not only do they have to show he knew about the $10,000 requirement, there's no evidence at all. That the chase letter was ever signed, mailed, or received. This is no evidence. It's just pure speculation that it was even mailed. But the knowledge element involves more than that. It has to show that, and this is unlike most of the cases you deal with in the circuit, where the person that's receiving the money had nothing to do with the bank account where the money was coming from. And the prosecutor even points that out to Judge McBride for one of the reasons he thought Nguyen Lee was not guilty because they didn't pull the bank accounts. So there wasn't knowledge that there was this amount of cash that they're doling out and structuring to avoid the CTR report. What about your argument that he would not have to report, he might not have reported income on the under $10,000 cash deposits? Well, the record is clear that none of the money that flowed into those accounts that allegedly were structured was part of the basis for the tax fraud. The tax fraud came from cash customers that were coming in to his business, walk-ins. Those are the ones that he wasn't recording. So it didn't make any difference. Now, it did arguably assist the customers, and if they were committing tax fraud, sure. Well, let me put it to you this way. Is there affirmative evidence that he paid the correct amount of income tax on all of the income that went into these accounts? Well, the evidence was that that went to his accountant. Now, I can't say... Well, the agent in the government stated that the tax fraud came from the walk-in cash. I guess that's the best evidence the record shows on that. But was the walk-in cash deposited into the accounts? No, it wasn't deposited. It was kept, and that was part of the cash hoard. There's no evidence one way or the other on whether he properly paid income tax on the cash, the under $10,000 deposits into these accounts. We just don't know one way or the other. Well, I know that that was not the basis for the tax fraud charge. We know that. So I think the inference is that it would have been on his returns if that was going to his accountant. Well, did the amounts in his returns match what was going into these accounts? I don't think the record's clear on that. They make a lot about the fact that they changed bank accounts, but the basis of that originally in the pre-Senate support in the argument originally made by the government is they pivoted to another bank. They didn't do that. It was in the very same bank. The reason they changed banks was their son, that was a part owner, wanted to go to medical school instead of staying in the family business. So they had to set up a new business arrangement. And when you have a new business, you've got to have a new corporation. You can't use the same bank account. But they didn't change banks. It was the very same bank. Now, the structuring, the activity in the accounts, all the activity diminished because of the fact that the defendant lost an exclusive distributorship to nail supplies. And really his cash, his income altogether was going down. And you can see that from the chart I included in the record excerpts. The bottom line is, and I don't want to respond. In five days, that's awfully close in time. Well, I guess I concede that, Your Honor. It is, it is. But the fact of the matter is they didn't move, they didn't change anything. The banks would have still been able to look at the volume of activity in the account. Well, how would they know that when the name changed, it was a different, it was the same signature on the account. What's the evidence that they knew or didn't know about the signature? Well, I mean, they didn't, the government didn't present any evidence. There's no evidence in the record to support it. And I think you can't draw an inference when there's no evidence to show anything. After June of 2012? Some, there was some. But there wasn't a lot because there wasn't that much business. Now, I want to make a point. The government's, the prosecutor made a point about the fact that these customers would call after each deposit. The records doesn't support that inference. What it shows, there was $13 million in total deposits made into those bank accounts. $13 million. There isn't any evidence they ever called about any of those. And it was only $4.1 million that was allegedly structured. He didn't have any motive to participate. And the evidence does not show that he did. And I support the reverse. All right. Thank you, Mr. Roper. Thank you, Ms. Falconer. We have the case. Your argument's helpful. The case will be submitted. We call up second case, Lonnie Acker versus General.